# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-864V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
I.J.,                               *      Chief Special Master Corcoran
                                    *
            Petitioner,             *      Filed: March 28, 2024
                                    *
v.                                  *
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
            Respondent.             *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Robert J. Krakow*, Law Office of Robert J. Krakow, P.C., New York, N.Y, for Petitioner.

*Catherine E. Stolar*, U.S. Dep't of Justice, Washington, DC, Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES[1]

On July 21, 2016, I.J. filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged that he suffered transverse myelitis ("TM") as a result of a Tetanus Diphtheria acellular-Pertussis vaccine he received on July 22, 2013. Petition (ECF No. 1) ("Pet.") at 1.

Although I granted entitlement to Petitioner in January 2022 (*see* Ruling, dated January 4, 2022 (ECF No. 143)), the parties have since that time been unable to resolve damages on their own. Petitioner claims he is entitled to pain and suffering, lost earnings, future medical care, and reimbursement of a Medicaid lien. Petitioner's Prehearing Brief at 1 (ECF No. 211). Respondent

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. §§ 300aa.

does not contest the appropriateness of these *categories* of damages, and has reached agreement with Petitioner on the pain and suffering amount to be awarded, but disputes some amounts or proposed treatments included in Petitioner's life care plan. Petitioner's Prehearing Damages Brief, filed September 20, 2023 (ECF No. 211) ("P. Br.") at 15 (agreement on pain and suffering); *see also* Respondent's Prehearing Damages Brief, filed September 20, 2023 (ECF No. 210) ("R. Br.").

A hearing on the disputed damages issues was held on October 16, 2023, in New York, NY. Based on the testimony heard at that time plus the parties' filings, and for the reasons set forth below, I find that Petitioner is entitled to (a) $250,000.00 in actual pain and suffering, as previously agreed by the parties, (b) $1,190,602.00 in actual lost wages, past and future, (c) a relocation/rent differential lump sum of $74,804.60, and (d) $626,327.70 to satisfy the outstanding Medicaid lien for previously-received medical care associated with the vaccine injury. Additionally, an award for the life care expenses granted will be issued consistent with this ruling once the parties provide a final life care plan.

## I.    Factual Background

A more complete summary of the relevant medical history and factual background is contained in the entitlement decision. Entitlement Decision, dated January 4, 2021 (ECF No. 114). I incorporate that history herein. In short, Petitioner has been found to have suffered TM due to vaccination—and as the damages hearing revealed, he has experienced numerous life-altering difficulties as a result.

## II.    Hearing Testimony

### A.    *Fact Witnesses*

1.    <u>I.J.</u> - Petitioner testified as a fact witness in the hearing. *See generally* Tr. at 12–62. He stated that he has gained some mobile function back since the start of his injury in 2013, but had interruptions in his therapy during the Pandemic. *Id*. at 13. Thus, he considers his condition largely the same, with minor improvements. *Id*.

In particular, I.J. remains confined to a wheelchair due to loss of control of his lower limb function. He can now move his right toes, and can sometimes move his left leg. Tr. at 13. But he still cannot walk, stand, or turn himself in bed. *Id*. at 14. He has also lost dexterity in his hands, which he cites as a safety issue - he cannot grab a doorknob or turn a key during an emergency. *Id*. The most he can do in bed is hook his arm around a bedrail to turn himself, but he fears his arm getting stuck in that situation. *Id*. at 15. Transfers (meaning moving between locations such as his bed, chair, and shower or toilet) are particularly difficult. *Id*. at 16. In most such circumstances, Petitioner requires a human aide to assist him in transfer, and even then falls can occur. *Id*. at 16, 36. He disputed contentions in Respondent's life care plan that he is able to move himself without assistance between his wheelchair and toilet. *Id*. at 17.

2

I.J. has made some efforts to improve his mobility. For example, he underwent a knee replacement surgery in 2017, after his physical therapist proposed that his knee issues would prevent any improvement in stability to assist in his own transfers. Tr. at 29–32. The surgery improved his ability to stabilize himself during transfers. *Id*. at 33. He remains unable to stand on his own, but can put some weight in his legs when being transferred to a car. *Id*. at 33–34. He believes that, with more therapy, he could improve his ability to put weight in his legs for a brief period of time. *Id.*

Because of these drastic mobility limitations, I.J. relies on health care assistants—both immediate family and outside professionals (although the primary such individual, as discussed below, turns out to be his uncle). He noted that his parents and wife (with whom he lives) have made significant accommodations to their personal schedules to assist in his care. Tr. at 24. Although his uncle, James Moore, has specific expertise in caring for an individual with Petitioner's needs, and is physically able to assist, there are instances where the relevant care agency sometimes sends caregivers who are older, and do not have the strength needed to move him. *Id*. at 36. (He believes that a ceiling-mounted lift system could help with this issue. *Id.*). In addition, there are times of the day when gaps in care lead to him being alone for significant amounts of time. *Id*. at 20. He is alone for at least two hours each morning, between the time his wife and daughter leave the house and when his caregiver arrives. *Id.* During this period, he cannot physically make it to a bathroom, which can cause skin and hygiene issues. *Id*. at 21. Additionally, he cannot make himself food or bathe. *Id*. at 22.

Petitioner's living accommodations provide some related cause for concerns when caregivers are absent. Tr. at 47. I.J. currently lives in a 16th floor apartment. *Id*. Recently, another apartment in his hall had a fire, which activated the fire alarm. *Id.* When he heard the alarm and tried to leave the building, he discovered that the elevators shut down in the event of a fire, leaving no way for him to escape. *Id*. at 47, 48. He believes a ground floor unit would provide him with a safer living environment. *Id.*

I.J. also provided testimony about other injury-related sequelae he experiences. He has continuous pain, which he described as a "stinging sharp sensation." Tr. at 25. He rates his pain as a 5-7 out of 10 on a daily basis. *Id*. at 26. He often uses cannabis to ease his pain. *Id*. at 29. He has had psychological counseling for coping with his limitations in the past, but does not have it now. *Id*. at 24–25. He found it helpful to process the emotions about his injury. *Id*. He can no longer work a regular job, but still makes a small amount of income selling music catalogs. *Id*. at 28. However, in 2022, he made only $2,000 per year from this venture after accounting for business expenses. *Id.*

Petitioner believes a number of therapy modalities would help improve his health and overall condition. Tr. at 39. For example, he received acupuncture therapy in the past through a program providing it to individuals with disabilities. *Id*. It helped his chronic pain so much that he did not need to take pain pills. *Id.* He cited similar improvements with massage therapy, which he

used to receive twice a week. *Id.* at 40. Though he has not yet had chiropractic care, one of his doctors recommended it to prevent spinal curvature. *Id.* at 41. In addition, I.J. testified that he goes to the gym regularly with his father or caregiver. *Id.* The strength that he gains through back exercises improves his ability to sit up straight. *Id.* at 42. He also benefits from use of the steam room for breathing issues. *Id.* He would like to start using the pool, and has spoken to gym management about his adaptive needs to do so, but would need the assistance of a qualified aide. *Id.* He believes the weightlessness of the pool environment would help him improve strength in his legs, in the hopes of eventually taking steps on his own. *Id.* at 43.

There are also a number of items that Petitioner maintains would aid him if obtained (or replaced more often). The existing bed he utilizes must be manually cranked to lower and lift—a difficult endeavor for him alone to perform. Tr. at 37, 38. He maintained that an automatic bed would be preferrable. *Id.* at 38. He has used for therapy a Functional Electric Stimulation ("FES") bicycle, which allows pedaling of a stationary bike while providing electronic stimulation to muscles. *Id.* at 46. Access to such a device at home would strengthen his legs, and help him work towards standing. *Id.* He also wants to use a standing wheelchair, which simulates standing for the brain and muscles. *Id.* at 47. And Petitioner noted that a number of adaptive equipment he uses at home (bedside urinals, a wooden sliding board, a shower chair) are all subject to wear and tear, and therefore for hygienic reasons should be replaced more often. *Id.* at 43–45.[3]

      2.    <u>Isaac Jones Sr.</u> - Mr. Jones (Petitioner's father) is 71 years old, and is a retired city property manager. Tr. at 64. He retired early to help care for his son after his injury. *Id.* When a care aide is unavailable, he goes to his son's apartment and helps him with all basic care needs, such as bathing, eating, and transferring between locations, providing these services without payment. *Id.* at 65, 67. When care was significantly interrupted by the Pandemic, he and his son contacted his brother-in-law, James Moore, to become Petitioner's aide. *Id.* He agreed that I.J. had made only small improvements in function since his 2013 injury. *Id.* at 67–68.

      3.    <u>James Moore</u> – Mr. Moore is Petitioner's uncle. Tr. at 75. Although he acts as Petitioner's primary in-home caregiver, his testimony revealed that he was uniquely suited for this position, because he has been employed as a care aide for over 20 years. *Id.* at 71. Although he has worked with different populations of individuals with care needs, such as children with special needs, adults with intellectual disabilities, and adults with physical disabilities, he is trained to assist with all activities of daily living. *Id.* at 71–73.

When care facilities shut down during the Pandemic, he began caring for Petitioner personally. Tr. at 75. He has now been working as Petitioner's aide for approximately three and a half years. *Id.* at 76. He is paid by Accent Care, through a program paying family members to

---

[3] I also note that Petitioner appears to be a very positive, intelligent, and articulate individual, who copes with his injury about as well as possible, and is to be commended for maintaining his spirits despite the debilitating setback he experienced due to no fault of his own.

provide care. *Id*. at 77. He works 40 hours per week, as allotted by the agency, and is paid $17.50 per hour. *Id*. at 77, 78.

When Mr. Moore arrives at Petitioner's apartment around 9:00 AM, Petitioner is in bed. Tr. at 78. He first helps Petitioner prepare for a shower by transferring him between his bed and shower chair. *Id*. at 79. To lower the bed, he must crank the handle about 45 times. *Id*. After Petitioner is in the shower chair, Mr. Moore wheels him to the bathroom. *Id*. His shower chair is then connected to a base piece in the tub, which allows him to transfer over to be bathed. *Id.* at 81. After bathing he is transferred back out of the tub, and taken into the bedroom. *Id.* Mr. Moore cranks and lowers the bed again, and transfers Petitioner onto the bed. *Id.* Once he is dressed, Mr. Moore transfers him back into the wheelchair and prepares breakfast for him. *Id.* at 82. After eating, they go to various activities, such as doctor's appointments or the gym. *Id*. they must drive to doctor's appointments, which requires Mr. Moore to transfer Petitioner into a car. *Id*. at 83.

Mr. Moore also noted that he performs many tasks for Petitioner, such as house cleaning, laundry, and a variety of errands. Tr. at 84. He then reiterated some of the points made in Petitioner's testimony regarding Petitioner's mobility limitations, and about several times where Petitioner fell during transfers. *Id*. at 84–88. He agreed that items such as a ceiling-mounted lift and an updated hospital bed would improve Petitioner's safety and quality of life, and make his care easier. *Id*. at 86–88.

B.    *Life Care Planners*

Both sides retained life care planners, who prepared lengthy written assessments of the specific care recommended for I.J. Petitioner's Report, dated September 14, 2023 (ECF No. 204-1) ("Lajterman Plan"); Respondent's Report, dated September 14, 2023 (ECF Nos. 203-1 and 203-2) ("Curtis Plan").

1.    <u>Linda Lajterman</u> - Ms. Lajterman received her nursing degree from the Charles E. Gregory School of Nursing in 1979. CV of Linda Lajterman, RN, filed September 14, 2023, as Ex. 114 (ECF No. 204-4) ("Lajterman CV"). She received additional certifications in medical-legal consulting, forensic medical fraud investigation, and life care planning for catastrophic cases. Lajterman CV at 1. She is licensed as a Certified Disability Management Specialist, Certified Case Manager, Certified Senior Disability Analyst and Fellow, and Certified Life Care Planner. *Id.* After over a decade in clinical nursing, she began working in case management at rehabilitation centers. *Id.* at 2. She later began working as a life care consultant, and owns an independent consulting firm. *Id.* She is presently licensed to practice nursing in New Jersey. *Id.* at 1.

Ms. Lajterman began her testimony by discussing the process of preparing the life care plan in this case. Tr. at 102. She first reviewed Petitioner's medical records to learn the nature of his injury, then conducted an interview with Petitioner via "Zoom" remote software. *Id*. During this interview, she asked him in detail about his abilities, and what assistance he needs throughout the day. *Id*. at 103. She then supplemented this information with further review of medical records,

including those from the rehabilitation facility. *Id*. She followed this with a second interview a few months later, and estimates the total interview time to be around three and a half hours. *Id*. at 105. Ms. Lajterman acknowledged she never performed an in-person site visit, nor did she physically meet with Petitioner in connection with the drafting of her plan. *Id.* at 146–49.

When testifying about the contents of her report, Ms. Lajterman was asked about the differences between her recommendations and those of the Respondent's expert, Linda Curtis. Tr. at 110. In many instances, their recommendations differed only in *how* the care was to be paid for—with Ms. Lajterman including the direct cost in her plan, whereas Ms. Curtis would list the item as covered by the insurance scheme she was proposing. *Id.* at 110.

Ms. Lajterman noted that she was not asked to comment on insurance coverage proposed for Petitioner by Respondent. Tr. at 111. She otherwise did not dispute that many of the life care plan items she provided for would be paid for entirely by insurance—and thus took no issue with instances in which Ms. Curtis represented this to be the case (although as noted below Ms. Lajterman did not agree in all circumstances that the *extent* of coverage of specific life care plan components under insurance would be sufficient). *Id.* at 146. In addition, Ms. Lajterman admitted that she applied a standard of attempting to maximize Petitioner's overall life enjoyment in ascertaining whether a life care plan item was proper, as opposed to what was medically sufficient or necessary. *Id.* at 153. And she noted that her recommendations were not limited to care directly associated with Petitioner's injury—meaning, for example, she allowed for costs for care from an audiologist, despite no demonstrated link to Petitioner's TM—but instead included in her plan all of the medical care he was currently receiving. *Id*. at 113, 150–51.

Overall, Ms. Lajterman determined that I.J. could do very little on his own—and she specifically testified that her views were confirmed after listening to his testimony during the damages hearing. Tr. at 104, 108. He requires assistance with toileting, bathing, meals, medical care, and errands, needing assistance even when performing tasks that he has some minimal capacity to attempt. *Id*. at 104. For example, I.J. may be able to call his pharmacy to renew a prescription, but then needs someone else to pick up the prescription and help him take the medication. *Id*. Petitioner is also at risk for falls in his home, and his fall risk score has not changed since he was initially discharged from rehabilitation. *Id*. at 106.

Based on his health status, Ms. Lajterman made a number of care recommendations, both for personal treatment and assistance as well as physical items or other accommodations. The largest proposed allocation was for in-home care, with Ms. Lajterman recommending 24-7 assistance (hence far more than the present 70 hours per week he receives). Tr. at 140; Lajterman Report at 10. She deemed his existing circumstances (in which he is frequently left alone for several hours every day) to be extremely unsafe, since "[t]here's a lot that could happen in two to three hours that could leave this man significantly injured, dead, unable to get out of the building." Tr. at 141. She instead proposes a permanent, live-in assistant, provided by an agency and paid at

a going hourly rate. *Id*. Working with an agency would ensure replacement aides are available (and she estimated a team of two to three people would be needed for full coverage). *Id*.[4]

Ms. Lajterman then testified about her recommendations for therapeutic modalities to be provided by treaters or care-giving professionals. Tr. at 113. She emphasized the need for Petitioner to receive regular physical therapy, for example, in addition to engaging in home or gym-based exercise program with the assistance of his aide. *Id*. She recommended twice-weekly sessions in her report, contesting the sufficiency of Respondent's recommendation of only once-weekly sessions that decrease in subsequent years (and if insurance only covered once-per-week sessions, she proposed an allocation of costs for a second weekly session). *Id*. at 115. She proposed a comparable, twice-per-week regime for both psychologic counseling (so Petitioner could address the mental health effects of his injury) and occupational therapy. *Id*. at 111, 122; Lajterman Plan at 8. And she recommended visits with a nutritionist three times a year (more than what Respondent proposed) where Ms. Curtis recommended only twice. *Id*. at 112.

While the parties disputed only the frequency of many of these components of personally-performed therapeutic care, Ms. Lajterman made some recommendations that Respondent questioned outright. For example, Ms. Lajterman proposed massage therapy, acupuncture, aqua therapy, and chiropractic care, all of which she deemed necessary in addition to physical therapy and gym sessions. Tr. at 121–22; Lajterman Plan at 8. She admitted that acupuncture, massage therapy, nutritional advice, and chiropractic care had not been recommended for I.J. by a doctor, but asserted that they were consistent with clinical practice guidelines. *Id.* at 154–55, 157.

Another potentially high-cost care item in Ms. Lajterman's plan involved home living modifications. Tr. at 131. In her view, Petitioner's current apartment, located on the 17th floor of his building, was "extremely unsafe"—making him a "sitting duck" in the event of a fire, since it would be exceedingly difficult to move him rapidly (and since he would be unable to do so absent personal assistance from a care-giver). *Id*. She proposed a $100,000.00 allocation, based on that of the Paralyzed Veteran's Association, and their estimation for modifications in the New York Metro area, to permit Petitioner both to obtain a ground-floor apartment and to make modifications to it (such as ramps or a ceiling-mounted lift system). *Id*. at 132; Lajterman Plan at 9. A lift system would particularly be beneficial, since it would render transitions of Petitioner easier to perform at home (even on his own), reducing the risk of an accident due to a fall. *Id*. at 127–28. The sling utilized in such a system would also allow him to assume something close to a standing position at a bathroom or kitchen counter. *Id*. at 128.

Ms. Lajterman then moved on to discuss some other specific aid equipment recommended for Petitioner's home. Tr. at 125. The three largest such items were the FES bicycle, an upgraded

---

[4] Ms. Lajterman also included in her estimate the cost for residential care, in the event that home care is no longer an option. Tr. at 143, Lajterman Plan at 10. However, Respondent's life care planner disputed the need for such contingency planning. Tr. at 238. I do not find that such a life care plan element is required under the circumstances, and it is not therefore included in my damages determination.

bed, and ramps. *Id*. at 126. An FES bicycle is only available in therapy environments, and not found in a regular gym. *Id.* However, Ms. Lajterman represented that she had in the past encountered instances in which individuals with spinal cord injury have home access to such a piece of equipment. *Id*. Individuals use the bike with electrodes placed on the skin, which stimulates muscle contraction and increase strength. She stated that this equipment would not wear out quickly, would likely be a one-time purchase, and would greatly aid Petitioner. *Id*. at 127.

Ms. Lajterman also proposed that I.J. receive a bed from the "ProBed" line. Tr. at 129. This bed aids in turning and repositioning immobile patients, to prevent them from having pressure sores and skin breakdown. *Id*. She recalled Petitioner's earlier testimony about a serious pressure wound on his back, which required him to lay on his front for five months to treat. *Id*. She opined that the cost of the bed (just under $50,000.00) equaled out to the cost of treating an open wound, and was therefore both justified and cost-effective as well. *Id*. Further, such a bed moves up and down manually, and does not need to be cranked by an aide. *Id*. at 130. When asked about the Respondent's argument that this bed should not be included because a bed frame and mattress is deemed a routine expense, she said she did not understand that recommendation. *Id*. at 131. She also clarified that this cost item was intended to cover a bed in a range of costs, rather than a specific model. *Id.* at 178.

Ms. Lajterman testified about the need for replacement portable ramps. Tr. at 130. These ramps could be taken to places that are not wheelchair-accessible, and set up so that Petitioner could access them. *Id*. She recommended that these ramps be replaced every five years to ensure safety and good working order, at a cost of $300. *Id.* at 130–131.

Next, Ms. Lajterman discussed her recommendation for wheelchairs and maintenance. Tr. at 134. One proposal—a custom standing wheelchair for Petitioner—was accepted by Respondent, and its cost would be covered by insurance. *Id*. But they disagreed on the cost allocation for maintenance, with Ms. Lajterman recommending an allocation of at least $500 per year, regardless of actual need, deeming Respondent's allocation of $109.80 inadequate. *Id*. at 134, 135. In addition, she recommended a specialized seat cushion to prevent skin breakdown, plus provision of a manual light wheelchair in case the primary wheelchair malfunctioned or was not otherwise accessible by a home care provider. *Id*. at 135, 136. Relatedly, Ms. Lajterman proposed cost provisions for a new, wheelchair-accessible van for Petitioner's transportation (to be driven by home care aides), plus allocations for its maintenance. Tr. at 138–39.

Finally, Ms. Lajterman identified a number of lower-cost care components. Lajterman Plan at 17. First, she recommended he be provided access to a medical alert system in case of emergencies. Tr. at 125 She proposed that bedside urinals be replaced weekly, as they must be cleaned carefully to prevent infection, and are relatively inexpensive. *Id*. She also testified that items such as sliding boards and shower chairs be replaced periodically due to wear and tear. *Id*. at 126. And she called for cost allocation for a number of miscellaneous small hygiene supplies

and medications (acknowledging that Respondent did not contest the need for the medications, and that almost all would likely be covered by insurance in any event). Tr. at 136, 138.

2.    <u>Linda Curtis</u> – Ms. Curtis earned a Bachelor of Science in Nursing from Florida State University in 1982, and a Master of Sciences in Health Services Management from Florida Institute of Technology in 1991. Curriculum Vitae of Linda Curtis, R.N., filed September 14, 2023 (ECF No. 204-3). She is a Certified Nurse Life Care Planner and Certified Case Manager. *Id.* She has over 40 years of nursing experience that has included caring for the ill and injured across the continuum of life. *Id.* Her acute care experience includes the following fields: Critical care, Medical-Surgical, Emergency, Cardiology, Rehabilitation, and Orthopedics as a staff nurse and supervisor. *Id.* Her areas of expertise include physical rehabilitation, spinal cord injuries, traumatic brain injuries, chronic pain, multi trauma, amputees, burn and orthopedic injuries. *Id.* Since 1995, she has been the President of Medical Record Review LLC, and has been retained by over 100 law firms and insurance carriers as a consulting expert. *Id.* She has prepared life care plans in the Vaccine Program over 300 times before. Tr. at 214.

Ms. Curtis based her life care plan recommendations on a review of the medical records, plus an in-person site visit with Petitioner. She visited Petitioner's home in October 2022, and spent slightly over two hours with him. Curtis Plan at 1; Tr. at 222. She also explained her overall approach in preparing a plan for Respondent. Her goal was to provide "adequate coverage for basic care needs," rather than to optimize Petitioner's quality of life. *Id*. at 218. Otherwise, she factored in offsets to create a plan falling within the guidelines of the Vaccine Program (which both functions as "payer of last resort," and also, in Ms. Curtis's understanding, does not aim for injury compensation to maximize an individual's possible quality of life overall, even if recommended care will move a petitioner in that direction). *Id*. at 220.

Ms. Curtis began her testimony by providing her perception of Petitioner's abilities—based upon her personal evaluation of him as well as his testimony at hearing. She noted his overall drive and high spirits, and that he was able to assist in his own transfers and simple tasks such as taking medication, but that he did require an aide to complete most needed activities of daily living. Tr. at 224, 216–17. Ms. Curtis also later acknowledged that, based on Petitioner's testimony, she had modified her position on some specific care issues. Tr. at 265. At the same time, she emphasized over and over that many care items would be adequately covered by insurance—and that the insurance regime she proposed (and which was not addressed in Ms. Lajterman's life care plan) was particularly comprehensive and reasonable. *Id.* at 220. Thus, her plan proposed funding for Medicare insurance, a Medigap policy, and Medicare Part D for prescription coverage. *Id*. at 220. In many cases, therefore, Ms. Curtis deemed Petitioner's life care plan elements to exceed not only what was medically reasonable, but to reflect costs that insurance would capture.

Regarding home care, Ms. Curtis denied the need for around-the-clock assistance. Tr. at 238. She noted that in her experience offering life care plan recommendation in Vaccine Program cases, she had only seen the need for that degree of care in a few rare circumstances, involving the

most severely-disabled individuals such as those in a coma and/or on a ventilator. *Id*. And her plan was intended to help improve Petitioner's functional abilities overall, allowing him to become more independent and rely less on caregivers. *Id*. at 249.

Nevertheless, Ms. Curtis recommended six hours per day of attendant care, totaling 42 hours per week (and increasing to eight hours a day, or 46 hours a week, when Petitioner turned 65). *Id*. at 240. In this amount of time, a caregiver could help Petitioner get ready at the beginning of the day, then leave him safely alone for independent activities in the middle of the day, returning in the evening to prepare dinner and help him go to bed. *Id.* Later in her testimony, Ms. Curtis allowed that Petitioner should not receive less than what he presently received, and that in fact she would be comfortable with him receiving eight to ten hours per day (adding that it was likely the insurance scheme she proposed would cover much of it). *Id*. at 253–54, 265.

Ms. Curtis was less supportive of many of the other proposed therapeutic treatments, however. For example, she contested Ms. Lajterman's recommendations for massage therapy, chiropractic care, and acupuncture. Tr. at 230. She deemed massages to be a "routine expense"— something that would typically be paid for by an individual but was not treatment-associated or needed in connection with the vaccine injury at issue. *Id*. In addition, physical therapy Petitioner would be entitled to receive through insurance would likely include some amount of massage. *Id.* at 230–231. When discussing chiropractic care and acupuncture therapy, she pointed out that there were no medical records of which she was aware recommending these therapies, rendering their need "speculative," and adding that she did not know of any scientific basis for their use in treatment of transverse myelitis. *Id*. at 231. Similarly, while Ms. Curtis agreed aqua therapy might be beneficial to Petitioner, she deemed it a care item that could be obtain in the context of insurance-covered physical therapy. Tr. at 232. By contrast, Ms. Curtis agreed that nutrition consultations might be beneficial, but deemed only four visits in total necessary. *Id.* at 231–32.

Other larger-scale items also were viewed by Ms. Curtis as unnecessary or not available in the Program. Full home modification to a rental, she proposed, was not possible legally,[5] and Petitioner's specific itemizations for it too speculative. Tr. at 234. And the danger of Petitioner's high-story apartment location (specifically in the event of a fire) was addressed by the lower-cost option of a medical alert system, which she had included in her own life care plan. *Id.* at 229, 235. In fact, this kind of system (which would permit Petitioner to obtain emergency assistance for a number of issues or potentially dangerous incidents) was a reason why 24-7 home care was unnecessary. *Id.* at 244.

Although she concurred for the need to modify any existing motor vehicle owned by Petitioner for his own access, she denied that the Vaccine Program allowed injured parties the purchase of a wholly-new vehicle. *Id.* at 227. (She also expressed the view that a vehicle modified to allow Petitioner himself to drive might provide a good therapeutic goal. *Id.* at 228). Ms. Curtis

---

[5] Later in her testimony, however, Ms. Curtis stated that if modifications could be made to a rental home, she would recommend them in this case. Tr. at 261–62.

accepted that access to an FES bicycle could be an effective therapy, but deemed Petitioner's ownership of such an expensive item an "over-the-top expense," adding that it was the kind of thing he likely could utilize elsewhere in the context of his physical therapy. *Id.* at 234; see Lajterman Plan at 17 (listed cost of FES bike is $19,500).

Ms. Curtis acknowledged Petitioner should obtain an automatic/non-cranking bed, but deemed the insurance scheme her plan established sufficient to obtain for him an excellent upgrade, even if at a lower cost than what Ms. Lajterman proposed. Tr. at 230. And she agreed to the need for the supplies, medications, and other sundries included in Petitioner's plan, but noted that she had proposed sums that she deemed most cost-effective, in keeping with the Vaccine Program's damages limitations. *Id.* at 236.

C.    *Vocational/Economic Experts*

1.    <u>Andrew Gluck</u> – Mr. Gluck prepared a single written report for Petitioner and testified at hearing. Analysis of Loss of Earnings of I.J., dated September 14, 2023, filed as Ex. 107 (ECF No. 34-2) ("Gluck Analysis"); Tr. at 182. Mr. Gluck maintained that Petitioner is unable to work due to his physical limitations, noting in support that he receives Social Security disability payments. Tr. at 183. Based upon this, he proposed to offer a calculation of Petitioner's total lost wages—actual as well as future—and provided an amount, although one he largely acknowledged had not been adjusted in any regard (and which in fact he attempted to adjust in the midst of testimony). Tr. at 192, 209.

Mr. Gluck received his undergraduate degree in Economics and Philosophy from the University of Florida in 1965. CV of Andrew Gluck, filed on September 14, 2023 (ECF No. 204-5). He went on to earn graduate degrees in Psychology and Vocational Rehabilitation, and worked in various settings as a psychologist, vocational counselor, and rehabilitation specialist. *Id.* In 1990, he completed an M.S. with coursework in microeconomics, accounting, applied social sciences, and administrative law. *Id.* He then earned his Ed.D. from Columbia University, through interdisciplinary studies in philosophy, economics, psychology, and statistics. *Id.* Since then, he has worked as a vocational economic analyst, in addition to teaching. *Id.*

To determine Petitioner's total lost wages, Mr. Gluck relied on Petitioner's tax returns and his offer letter from NYU (his former employer at the time of injury).[6] Tr. at 185. He then adjusted Petitioner's yearly earnings for inflation, and added on a 24.4% fringe benefit rate based on the national average for fringe benefits (in order to include the value of non-direct salary compensation benefits). *Id.* at 186. Mr. Gluck deemed this rate to be conservative, since an educational entity like NYU can provide a wider array of benefits than other employers, such as tuition credits. *Id.* On cross-examination, however, Mr. Gluck noted that his fringe benefits calculation came from the Bureau of Labor Statistics average, and that he had not used a rate specific to the hospital industry (a relevant consideration given Petitioner's employment at the time of injury). *Id.* at 194–

---

[6] Petitioner was then starting a job as a Patient Advocate at NYU Medical Center. Entitlement Decision at 8.

95. But he deemed industry-specific calculations of little utility, unless the individual is a union worker, municipal worker, or a very high earner. *Id*. at 197.

Mr. Gluck then used the Department of Labor's American Community Survey to estimate Petitioner's remaining working years from the time of his injury. Tr. at 188. He concluded that Petitioner had 26.3 working years left as August 2013 (the time of his injury), factoring in the probability of death, job loss, or non-participation in the workforce. *Id*. Notably, Mr. Gluck acknowledged at hearing that his initial report did not discount the lost wages sum for likely taxes that would have been imposed on earnings. *Id.* at 189. But (and taking into account Respondent's expert's analysis in his own written report) he proposed to do so in his testimony, and based upon that (and as reflected in Petitioner's pre-hearing submission) he offered a reduced sum, offset by taxes, in the amount of $1,586,204. *Id.*; Petitioner's Prehearing Brief at 34.

This was not the only reduction agreed to by Petitioner and Mr. Gluck at hearing. Mr. Gluck also admitted that his calculations differed from those of Respondent's expert in a number of ways—and that many of the differences favored Respondent's analysis. Tr. at 190. For example, he did not deduct for Petitioner's disability benefits, received starting in August 2013, which he is eligible for through October 2023. *Id.; see* Kennedy Analysis (ECF No. 203-4) at 4 (explanation of Petitioner's disability benefits). On re-direct, Mr. Gluck clarified that deducting the disability benefits was in fact necessary—and that doing so would further lower his estimate of lost past and future wages to $1,432,704.00. *Id*. at 209.

In addition, Mr. Gluck applied a different net discount rate approach, relevant in reducing the value to net present value of sums Petitioner was maintaining he would have earned in the future. Rather than the 1.25 percent figure embraced by Dr. Kennedy, Mr. Gluck had used a half point increase based on "long-term rates of wage growth and T-bill rates." Tr. at 190. In so doing, he believed the difference between a present value on a wage sum and future amounts effectively zeroed out. *Id.* at 189. He also testified that this approach was often used in litigation in Pennsylvania state court matters that he testified in—although he did not explain why that approach would have utility or persuasive force in the Vaccine Program case. *Id.* at 198.

Ultimately, however, Mr. Gluck acknowledged that he did not fully understand why the discounting methods were different, and he even seemed to concede that Dr. Kennedy's reasoning on the matter was persuasive. Tr. at 190–191. Regardless, he noted that the remaining gap between the parties' positions on total lost wage sums (applying the competing discount rate approaches) was only $200,000-300,000. *Id.* at 191.

    2.    Dr. Patrick Kennedy - Dr. Kennedy is an economist, and he provided his own calculation of lost wages for this matter. Respondent's Loss of Earnings Analysis, dated September 14, 2023 filed as Exhibit U (ECF No. 203-4) ("Kennedy Analysis"); Tr. at 270.

Dr. Kennedy holds a bachelor's degree in Economics from the University of California, San Diego and a Doctorate in Economics from Stanford University. Curriculum Vitae of Patrick

Kennedy, filed on September 14, 2023 (ECF No. 203-5). He has been a managing director with Torrey Partners, a managing director with LECG, a shareholder with Mack Barclay, Inc., a director of economic research with International Securities Group and an economist with the Board of Governors of the Federal Reserve System in Washington, D.C. *Id.* He is currently an economist and Managing Director with Stout. Stout is a global investment bank and advisory firm specializing in corporate finance, accounting and transaction advisory, valuation, financial disputes, claims, and investigations. *Id.* Dr. Kennedy routinely analyzes loss of earnings in state and federal court, including in Vaccine Program matters. Tr. at 270. He testifies in equal amounts for plaintiffs and defendants. *Id.*

In this case, Dr. Kennedy estimated Petitioner's lost wages, after offsets and discounts, to be $1,190,602.00. Tr. at 271. To arrive at this figure, Dr. Kennedy (like Mr. Gluck) used records of prior earnings, multiplied by a statistical work-life expectancy. *Id.* at 272. However, Dr. Kennedy used a wage growth rate specialized to the hospital industry, given Petitioner's occupation at the time of injury. *Id.* As he explained, wage growth for hospital employment is historically higher than national wage growth. *Id.* at 273. He also used a fringe benefit average (19.89%) specific to hospital employees, a figure slightly lower than the one used by Mr. Gluck. *Id.* He used a similar adjustment for income taxes. *Id.* Dr. Kennedy also came to a slightly different figure for disability payments—a total of $185,326 after applying a present value calculation and discount rate. *Id.* at 274–75.

Besides the above, Dr. Kennedy's calculation also relied on a different net present value discount rate. Kennedy Analysis at 5–9. In so doing, he took issue with Mr. Gluck's use of the "total offset method," stating that "[i]t's effectively a net zero discount rate." Tr. at 274. Indeed, Dr. Kennedy maintained that even if the alternative discount rate had been properly applied, he would "have a material disagreement with that approach." *Id.* His methodology uses both the historical relationship between interest rates and inflation, and future projections "on things like the Social Security Trust Fund, the OMB, Office of Management and Budget, and, importantly, the Federal Reserve projections." *Id.* at 276. Mr. Gluck's figures, by contrast, relied on the use of 30 or 90-day Treasury bills, rather than five-year US Treasuries. Dr. Kennedy opined that five-year Treasuries would be a more appropriate investment than T-bills, so he used that option in his calculation. *Id.* at 278–279.

Dr. Kennedy also explained why he did not include employer contributions to Social Security in his calculations. Tr. at 280. There is "significant uncertainty" as to whether Petitioner would ever be able to receive Social Security benefits—he testified that the reserves are projected to run out by 2037, before Petitioner reaches Social Security retirement age. *Id.* at 281. Further, a calculation for Petitioner would need an offset to account for his receipt of SSDI benefits. *Id.* at 281–282. Factoring this in would reduce Petitioner's total loss by nearly $400,000. *Id.* Thus, given the uncertainty of Petitioner ever benefitting from these contributions, he chose not to subtract this amount from his estimate. *Id.*

13

III.    **Relevant Law on Damages Determinations**

A.  *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(A)(i) –(iii). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

As noted above, this provision of the Act permits recovery of costs *to be incurred* for future care as well, although such costs must be shown to be "reasonably necessary." Section 15(a)(1)(A)(iii)(I) –(II). The meaning of the phrase "reasonably necessary" is somewhat imprecise, as I have recognized in other cases. *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2016 WL 3577540 (Fed. CL. Spec. Mstr. May 12, 2016). But it encompasses the idea that additional care aimed at maximizing an injured party's overall well-being (not matter how personally deserving the individual may be) is *not* in keeping with the scope of damages envisioned by the Program. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448135, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life"); *see also Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining the term to mean more than merely barely adequate, but less than the most optimal imaginable). And it goes almost without saying that such costs must *also* pertain to care associated with the alleged injury or its sequalae. Medical care a petitioner might receive, even if needed, that is not aimed at treatment of the vaccine injury at issue, or related to it, is not a reasonably necessary future care component.

B.  *Lost Wages – Past and Future*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)). Moreover, the Vaccine Act requires that any award of compensation relating to future damages shall be reduced to its net present value. Section 15(f)(4)(A).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of

earnings' includes speculation" and thus refusing to allow lost wages on a planned business venture that was too indefinite); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020 (citing *J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with *some* evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

## IV.    Appropriate Compensation in this Matter – Disputed Components

### A.    Lost Wages – Past and Future

Petitioner requests a total award of $1,432,704.00, for past and future lost wages. To support this component of his damages demand, Petitioner relies on a mix of earnings documentation and expert input from Mr. Gluck. *See generally* Gluck Analysis; Petitioner's Tax Returns 2008-2013, filed on August 18, 2023 (ECF No. 200); Petitioner's Employment and Earning Records, filed on March 24, 2023 (ECF No. 106). Respondent agrees that Petitioner cannot re-enter the workforce, and is entitled to past and future lost wages, but (relying on the same background information about Petitioner's prior earnings) estimates Petitioner's total lost earnings to be the lesser sum of $1,190,602.00. Kennedy Analysis at 11. And as noted above, Respondent applies a 1.25% offset rate, along with a fringe benefits rate specific to the hospital industry, where Mr. Gluck applies one based on more general labor statistics. Kennedy Analysis at 10.

Respondent's calculation was plainly better-defended and explained by Dr. Kennedy, and was more persuasive than what Mr. Gluck proposed. Indeed, Mr. Gluck admitted at hearing that his initial figure lacked numerous necessary discounts (in particular taxes), and then conceded he could not rebut Dr. Kennedy's discount rate reasoning. Tr. at 190–191. I also note that a discount rate in the range proposed by Dr. Kennedy is far more in keeping with how that rate has been calculated in prior Vaccine Program cases, over more than 20 years. *See,* e.g., *Watkins v. Sec'y of Health & Hum. Servs.,* No. 95-154V, 1999 WL 199057 (Fed. Cl. Spec. Mstr. Mar. 12, 1999) (discussing in detail the calculation of net discount rates and agreeing with the method used by Dr. Kennedy).

Accordingly, Respondent's proposed figure was persuasively established, and calculated "in accordance with generally recognized actuarial principles and projections." Section

15(a)(3)(A).[7] And (again, by Mr. Gluck's admission) the sum I will order does not reflect an egregious drop in total lost wages to be paid, when compared against Petitioner's demand. Therefore, and based on the evidence filed, I shall award Petitioner **$1,190,602.00** in lost wages, both actual and future.

### B.    Medical Care Expenses

Overall, Respondent's life care planner Linda Curtis offered a more persuasive evaluation of Petitioner's medically-established needs. Ms. Curtis visited Petitioner in person before making her recommendations, giving her a more accurate perspective on his day-to-day activities and limitations. She also did a better job taking into account Program guidelines for what kinds of costs are allowable. At the same time, Petitioner's own testimony (supplemented by the other fact witnesses and Ms. Lajterman) confirmed his need for some cost categories exceeding what Respondent was willing to accept. I provide a brief run-down of my findings on disputed categories below.

### 1.    *Insurance*

Ms. Curtis recommends comprehensive Medicare coverage as part of Petitioner's award, to cover many of the items Petitioner's life care planner recommended - but at a lower cost to the Program. She has also provided an interlocking system of coverage, to ensure no gaps occur. Curtis Plan at 2. Petitioner has voiced no objection to Ms. Curtis's insurance recommendation (and in fact did not even attempt to take into account whether certain proposed life care plan items would even *be* covered under such insurance).

Accordingly, damages in this case shall include the costs of this insurance package (to be determined in connection with any annuity product that must be obtained to ensure future care sums are available). As discussed below, only in instances in which a proposed care item is *not* likely to be covered under such insurance are provisions included for the extra cost.

### 2.    *Wheelchair*

Petitioner will be granted the cost of all of the wheelchair components requested, including a custom standing power wheelchair, battery replacements, maintenance, a specialized seat

---

[7] While the Federal Circuit has not interpreted what qualifies as "generally recognized actuarial principles and projections," there are several decisions that interpret "actuarial principles" in a broader sense from other federal and state statutes, where actuarial data and expert opinions are required to substantiate damages. *See, e.g.*, *Chabner v. United Of Omaha Life Ins. Co.*, 994 F. Supp. 1185, 1194 (N.D. Cal. 1998), *aff'd*, 225 F.3d 1042 (9th Cir. 2000) (finding that under the Americans with Disabilities Act, sound actuarial principles "must . . . include reference to some sort of actuarial data either in the form of actuarial tables or clinical studies estimating mortality rates"); *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 480 (S.D.N.Y. 2014) (taking into account conflicting expert testimony when assessing "accepted actuarial principles" under a New York statute).

cushion, and a manual backup wheelchair. This will amount to a total of $84,968.00. Lajterman Plan at 19.

### 3.    *Ceiling-Mounted Lift System*

Within 30 days of this Ruling, Petitioner shall inform me whether under City of New York and other applicable rent and apartment law policies modification of a rental apartment may be made for a disabled tenant to install the requested ceiling-mounted lift system, and the cost. If this is permissible under law, the cost shall be included in the damages award, regardless of insurance coverage. If impermissible, however, it shall not be included.

### 4.    *FES Bike*

Petitioner has not shown that it is medically necessary for him to own an FES bike that would be located in his home. He is instead encouraged to access a FES bike at a physical therapy center, as part of any such sessions covered by the comprehensive insurance coverage proposed by Respondent.

### 5.    *Home Care Assistance*

Respondent's expert made a compelling argument that Petitioner can be left alone for short periods of time if provided with a medical alert system in case of emergency. In addition, Petitioner has not demonstrated that the severity of his injury-related deficiencies merit round-the-clock home care. As noted at hearing, however, Respondent concedes Petitioner should receive at least 8-10 hours a day of this care. Tr. at 265. And I find he should not receive *less* such care than is presently provided to him—and he currently receives 70 hours per week of care. *Id.* at 140. Thus, he will be provided with the cost of 10 hours per day of attendant care, at a rate of $29.00 per hour.

### 6.    *Physical and Occupational Therapy*

Petitioner will not be separately awarded the cost of physical and occupational therapy, as he can likely obtain any such needed care via the Respondent's recommended insurance.

### 7.    *Audiology*

Petitioner has not shown a specific link between any hearing issues he suffers and his vaccine injury. Thus, the cost of audiology care will not be separately covered (although he may otherwise seek any needed care that would otherwise be covered as a medical expense under Respondent's recommended insurance scheme).

### 8.    *Cannabis*

Cannabis cannot be a covered medical expense under the Vaccine Program, even if prescribed by a treater, as it is a Schedule I controlled substance under the federal Controlled Substances Act, 21 U.S.C. § 801, et seq. I therefore do not include the cost of this treatment in damages.

### 9.    *Acupuncture*

Petitioner will not be awarded the cost of acupuncture therapy, as he has not shown that it was recommended by a doctor for his injury.

### 10.    *Nutritionist*

Petitioner will not be awarded the cost of consults with a nutritionist. He may instead obtain coverage for such advice via Respondent's proposed insurance scheme.

### 11.    *Massage Therapy*

Petitioner will not be awarded the cost of massage therapy, as he has not shown that it is recommended by a doctor for his injury. He may instead obtain coverage for massage via Respondent's proposed insurance scheme (and specifically any physical therapy sought thereunder).

### 12.    *Gym Membership/Aqua Therapy*

Petitioner will be provided with the cost of an annual gym membership to work on his mobility in his free time. Within 30 days of this Ruling, Petitioner will propose a sum to cover a local gym membership. Petitioner will not be provided a separate award of costs to cover aqua-therapy, but is encouraged to identify a gym that could provide pool access, and/or seek such therapy in the context of any physical therapy obtained via insurance.

### 13.    *Psychological counseling*

Petitioner will not be provided with the cost of psychological counseling, as this will be covered by Respondent's proposed insurance scheme.

14.    *Medical Alert System*

The parties agree on the need for a life alert system, to safeguard Petitioner when alone. Both Petitioner and Respondent have listed the cost of this system as $300.00 per year to Petitioner's life end, and accordingly this sum shall be provided for as an ongoing medical costs.

15.    *Supplies*

Petitioner will be provided with the cost of all hygiene supplies requested, including incontinence products, gloves, wipes, bed pads, and condom catheters, for a total of $107,835.83. He will also receive most of the larger care supplies he requested, such as bedside urinals (replaced weekly), sliding boards, and rolling shower chairs and commode. Going by Petitioner's estimate, periodic replacement of these items will cost approximately $591.60 per year to Petitioner's life end.

16.    *Prescriptions*

All necessary medications and prescriptions should be available under Respondent's proposed insurance scheme, and therefore no additional damages component is needed to account for this expense. Although some prescriptions requested in Petitioner's life care plan (*i.e.,* Cialis) have not been shown to be reasonably necessary for treatment of his transverse myelitis, it is likely he can seek reimbursement for them under Respondent's proposed comprehensive insurance policy.

17.    *Wheelchair-Accessible Vehicle*

The cost of a new wheelchair-accessible van is deemed a routine expense not compensable under the Program (except in rare circumstances not present herein), and therefore I do not provide for this in damages. *See Petronelli v. Sec'y of Health & Hum. Servs.*, No. 12-285V, 2016 WL 3252082, at *2 (Fed. Cl. Spec. Mstr. May 12, 2016) (Petitioner not awarded cost of a wheelchair-accessible van when she was capable of traveling in a standard vehicle for short distances). However, Petitioner will be awarded the cost of wheelchair-accessible modifications to a vehicle, and routine updates to these modifications, as recommended by Respondent's expert. This will total $29,000.00. Curtis Plan at 15–16.

18.    *Bed*

Petitioner has made a compelling argument that he needs a semi-electric bed, rather than one that must be manually cranked by a caregiver to move up and down. However, Ms. Curtis established in her testimony that a semi-electric bed will be covered by proposed insurance, and Petitioner did not otherwise establish that the specific model of bed requested would be the only

reasonably adequate modality to aid his health. Accordingly, I do not provide herein for a separate item of coverage for a new bed.

     C.    <u>Apartment Relocation Expenses</u>

Petitioner and Ms. Lajterman made compelling arguments at the hearing about Petitioner's safety concerns in the event of a fire. Petitioner currently resides on the 17th floor of his apartment building. Because elevators normally shut down during a fire, his only route of escape would be the building stairs. But the fact that he is wheelchair-bound means first responders not only would have to carry him down seventeen flights of stairs, but also make it up to the 17th floor in the first place. In the case of a serious fire emanating from the lower level of the building, there is a significant chance emergency personnel would not be able to rescue Petitioner in time. Thus, due to his injury, a first floor or very low floor apartment is a reasonable accommodation for Petitioner's overall safety.

As of the time of the hearing, the record lacked sufficient information about the cost of Petitioner's current apartment versus what sums would be needed to obtain an apartment on a lower floor. Accordingly, after a status conference on January 31, 2024, I asked Petitioner to propose a calculation for the cost of moving to a comparable, first-floor apartment, and he has done so. Memorandum, dated February 29, 2024 (ECF No. 223) ("Memorandum"). Respondent then filed his own brief on the topic. Response, dated March 15, 2024 (ECF No. 224) ("Response").

Petitioner's memorandum includes an affidavit from Petitioner and information for comparable apartments in Brooklyn, NY. *See generally* Memorandum. He provides the layout of his current apartment for reference. *Id.* at 4–6. He also provides online listings for various apartments, ranging in monthly rent costs from $8,995.00 to $2,180.00. *Id.* at 8–34. Petitioner's affidavit represents that he consulted several movers and received verbal estimates of approximately $5,000.00 for his move. *Id.* at 152. He also explains that his current apartment complex is rent-subsidized. *Id.* Once he receives damages in this case, he will exceed the asset limits for the complex. *Id.* He then provides a list of prices and locations for the apartments he found in internet searches, but notes that some of the apartments are not in safe areas. *Id.* at 154–155.

Respondent has opposed the award of any relocation-related costs. First, he maintains that the language of the Vaccine Act in Section 15(c) prohibits awarding the cost of a new rental unit, stating that the amount for residential and custodial care must "be sufficient to enable the compensated person to *remain living at home*." Response at 3; 42 U.S.C. § 300aa-15(c). In support, he offers legislative history evidence suggesting that this kind of damages award was not

contemplated as reasonably covered by the Vaccine Act at the time of its promulgation. Response at 4.

In addition, Respondent cites several cases in which Petitioners were denied the cost of purchasing a new home entirely, or funds for building an addition onto their current home. Response at 5–7; *Marrero v. Sec'y of Dep't of Health & Hum. Servs.*, No. 88-12V, 1990 WL 293367 (Cl. Ct. Spec. Mstr. May 23, 1990); *Gresh v. Sec'y of Dep't of Health & Hum. Servs.*, No. 89-91V, 1990 WL 270206 (Cl. Ct. Spec. Mstr. Oct. 26, 1990). And he contests that the risk to Petitioner's safety is sufficient to justify such expenses. He notes, for example, that Petitioner testified at hearing that firefighters knocked on his door after another unit on the hall had a minor fire- thus proving his accessibility to first responders. Response at 8; Tr. at 59–62. Respondent instead deems security at the existing apartment complex adequate to protect Petitioner in an emergency situation. *Id.* Respondent further argues that Petitioner could have moved by now were this a real concern, since his injury occurred more than ten years ago. *Id.* at 9. Otherwise, Respondent denies the probative value of the evidence Petitioner has offered to establish comparable apartment costs, noting that several of the apartments listed were either inaccessible or located on even *higher* floors than Petitioner's current apartment. *Id.* at 9–11.

Although Respondent correctly observes several deficiencies in Petitioner's justification for a particular *amount* of award[8] for this damages component, he is unpersuasive in his larger argument that this kind of cost *cannot* be awarded in the Vaccine Program. First, most of the cases cited involved the distinguishable circumstance in which a claimant sought damages sufficient to purchase an *entirely* new home. *See,* e.g., *Marrero*, No. 88-12V, 1990 WL 293367. Here, by contrast, the question is to what extent the *differential* between Petitioner's existing rental property and one that would pose less of a safety risk is justified. Petitioner is not requesting (nor would I agree to award) *total* rental coverage for the remainder of his life.

Second, many of Respondent's case citations actually involve circumstances in which petitioners were provided with damages merely to alleviate housing issues posed by an existing property (and are thus somewhat consistent with the current request). In one such case, for example, petitioners were awarded $38,148.00 for the yearly cost of a group home for their disabled son, rather than some amount to obtain a different apartment suitable for his needs. *Kono v. Sec'y of Dep't of Health & Hum. Servs.*, No. 93-123V, 1995 WL 774598, at *16 (Fed. Cl. Spec. Mstr. Dec. 21, 1995). Notably, the *Kono* petitioners had failed to submit any documentation supporting their request for rental costs into the record, and yet some provisions for this cost were made.

Finally, there is some (albeit limited) case support for the propriety of damages components aimed at shielding wheelchair-bound petitioners from the risk of fire. In *Hale v. Sec'y of Dep't of*

---

[8] Indeed, Petitioner's filing does not even attempt to propose a final figure.

*Health & Hum. Servs.*, No. 90-13V, 1990 WL 608696, at \*7 (Cl. Ct. Spec. Mstr. Oct. 16, 1990), *mot. for review den'd*, 22 Cl. Ct. 403 (1991), a petitioner was awarded $30,000.00 for home modifications to accommodate their wheelchair-bound son. The special master in that case specifically noted that "[i]n the event of fire or other emergency, additional smoke detectors **and an exit from Christopher's bedroom is needed.**" (emphasis added).

Here, Petitioner faces some risk if he continues to live in a high-floor apartment. The minor fire mentioned in his testimony that occurred on his hallway, during which firefighters knocked on his door to alert him, is not at all comparable to the possibility of a severe, structure-destroying fire that would put Petitioner in grave danger. Petitioner's concerns about the reliability of emergency services in a large city are also well-founded. And the contention that Petitioner could have already made more effort to secure a lower-floor apartment fails to take into account the housing difficulties faced by low-income individuals—especially those who already have rent-subsidized apartments in New York City.

Thus, while Respondent is correct that the risk from fire or other natural disaster is not *certain*, it is sufficiently realistic that *some* provision should be made herein for Petitioner to obtain a more evidently-safe living situation. I thus find an award of damages to enable relocation is warranted. However, the amount to be awarded remains to be calculated—and on this issue, Petitioner's evidentiary inputs are not especially helpful. Under such circumstances, I deem it in the interests of justice (and to avoid awarding damages for too speculative a concern, or that amount to windfall) to fashion a lump sum amount sufficient to cover moving expenses and some amount of transitional rent costs for a lower floor apartment.

Prior cases in the Program, including some cited by Respondent, have awarded similar lump sums for petitioners to use as they see fit in securing adequate housing for disabled individuals. For example, in *Anghel v. Sec'y of Dep't of Health & Hum. Servs.*, No. 90-210V, 1991 WL 211867, at \*3 (Cl. Ct. Oct. 3, 1991), in lieu of home modifications not found to meet the Act's "reasonably necessary" standard, an award of $40,000.00 was permitted for house alterations "to be spent **as the Anghel family sees fit.**" (emphasis added). This figure was based on the estimate for the average cost of wheelchair-accessible home modifications as determined by the National Spinal Cord Injury Research Center. Other cases have also provided for lump sum housing awards that permit a petitioner discretion in their utilization. *See,* e.g., *Gresh v. Sec'y of Dep't of Health & Hum. Servs.*, No. 89-91V, 1990 WL 270206, at \*7 (Cl. Ct. Spec. Mstr. Oct. 26, 1990) (awarding $45,000 for home modifications, and stating "[t]his amount will provide for a wheelchair accessible bathroom and permit petitioners to **select among other proposed modifications.** If petitioners determine that modification of the present structure is not feasible, the amount **may be applied towards the purchase of a more appropriate home**" (emphasis added)); *see also Marrero*, 1990 WL 293367, at \*11 (awarding $100,000.00 for home renovations, and stating that

"[i]f zoning ordinances prohibit such construction at the Marrero's current residence, the amount awarded would enable the Marrero's to make similar renovations to a comparable house").

As noted, while Petitioner has offered some information that can be used to calculate a relocation lump sum, it provides no total amount requested, and is not fully reliable. However, he has offered sufficient evidence to establish not only a reasonable moving cost, but a range of possible rent increase outcomes—and these sums are not specifically undermined by Respondent's broad-based contentions. I will therefore include a lump sum of **$74,804.60**, based upon estimates of (a) $5,000.00 to move, and (b) an average rent increase[9] of $13,960.92 per year ($1,163.41 x 12), with *five years* of this sum included. The increase is capped at five years to account for the possibility that Petitioner ultimately opts not to move (or finds an apartment with a comparable cost), so as not to grant him an unreasonable windfall, and also since the true risk of a catastrophe attributable to his current higher floor circumstances cannot be predicted to any degree of certainty.

## CONCLUSION

In light of all of the above, I find Petitioner is entitled to (a) $250,000.00 in actual pain and suffering, as previously agreed by the parties, (b) $1,190,602.00 in actual lost wages, past and future, and (c) a relocation/rent differential lump sum of $74,804.60. These figures will be incorporated in the final damages decision to be issued in this case. The amount of $626,327.70 will also be specified in the Decision to satisfy the outstanding Medicaid lien for previously-received medical care associated with the vaccine injury.

The parties shall prepare a joint final life care plan spreadsheet incorporating my rulings herein on disputed categories of care that can be appended to the Decision. They shall file this document on or before **April 30, 2024.**

---

[9] To arrive at the $1,163.41 per month increase figure, the following calculation was employed: Petitioner's list of comparable apartment rents (Memorandum at 154–155) was evaluated for reasonableness, with several units listed deemed to be luxury accommodations, and hence not fairly included in the calculation. In addition, relying on Petitioner's current housing situation, all rental prices in excess of $5,000.00 per month were removed from consideration.

The twelve remaining amounts set forth in Petitioner's submissions (ranging from $2,180.00 per month to $4,800.00 per month) were then averaged, resulting in the amount of $2,769.41. This sum was then compared against Petitioner's current rent. Notably, Petitioner did not specify in his affidavit what amount he pays per month currently, but his apartment complex's website shows two bedroom units starting at $1,606.00 (Spring Creek Towers, https://www.springcreektowers.com/theapartments.html). This amount was subtracted from the average, showing a monthly increase of $1,163.41 ($2,769.41-$1,606.00=$1,163.41). This figure was in turn multiplied by twelve to determine a yearly amount ($1,163.41 x 12= $13,960.92), and then in turn multiplied by five to account for five years ($13,960.92 x 5= $69,804.60). This amount was added to the $5,000.00 moving cost estimated by Petitioner. Memorandum at 152. Thus, adding the sums together ($69,804.60 + $5,000.00=$74,804.60) yields the amount to be awarded.

**IT IS SO ORDERED.**

<u>s/ Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master